VIRGINIA DELL RUSH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rush v. Commissioner
Docket No. 10609-78.
United States Tax Court
T.C. Memo 1985-65; 1985 Tax Ct. Memo LEXIS 563; 49 T.C.M. (CCH) 737; T.C.M. (RIA) 85065; February 13, 1985. Virginia Dell Rush, pro se. Frank Simmons, for the respondent. SCOTT *2 MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: On June 23, 1978 respondent mailed to petitioner, Virginia Dell Rush, a notice determining that the liabilities of Quinton W. Rush, deceased, for the taxable years ended December 31, 1967, and December 31, 1968, in the amounts of $8,618.17 and $13,350.78, and additions to tax under section 6653(b) in the respective amounts of $4,309.09 and $6,675.39, plus interest as provided by law, constituted her liability as transferee of assets of Quinton W. Rush. The issues for decision are: (1) Whether petitioner is s transferee of assets of Quinton W. Rush within the meaning of section 6901, [1] and if so, the value of the assets transferred to petitioner by Quinton W. Rush; and (2) whether the statute of limitations prohibits the assessment against petitioner of liability as transferee for taxes owed by Quinton W. Rush, *565 deceased, for the calendar years 1967 and 1968. FINDINGS OF FACT Petitioner, Virginia Dell Rush, resided in Saraland, Alabama, at the time her petition in this case was filed. The tax returns of Quinton W. Rush and his then wife, *739 Mabel M. Rush, for the calendar years 1967 and 1968 were filed with the Internal Revenue Service Center, Chamblee, Georgia. Quinton W. Rush and Mabel M. Rush were married on December 24, 1941. They remained married until 1969, in which year they were divorced. In the divorce proceeding, the family home in Chickasaw, Alabama, its furnishings, an automobile and some church bonds were awarded to Mabel M. Rush, together with alimony and child support payments. Mabel M. Rush lived in the house in Chickasaw until 1971 when she moved to Mobile. The remainder of the property owned by either Mr. or Mrs. Rush was awarded to Mr. Rush. This property consisted of a little over 15 acres of land in Clarke County, Alabama, a vendor's lien on a piece of property on Strange Street in Saraland, together *566 with the notes secured by that vendor's lien, and all the stock of a corporation, Rush Skid & Pallet Co., Inc., which consisted of 50,000 shares. In the latter part of November 1970, Mr. Rush was operated on for cancer. At first, the surgeon believed the prognosis to be good but by February 11, 1971, had discovered that all the malignancy had not been removed and that Mr. Rush's prognosis was indeed grave. The surgeon informed Mr. Rush of his condition sometime in the spring of 1971. *4 On August 6, 1971, petitioner in this case, Virginia Dell Rush, and Quinton W. Rush were married. Mr. Rush died on October 6, 1971. On August 25, 1971, Quinton W. Rush transferred to petitioner and himself as joint tenants with right of survivorship the 15 acres of real property he owned in Clarke County, Alabama. On August 16, 1974, petitioner sold this property in Clarke County, Alabama, for $7,927.65, consisting of $5,000 cash and forgiveness of indebtedness to the corporation of $2,927.65. On August 31, 1971, Quinton W. Rush transferred to petitioner and himself as joint tenants with right of survivorship the 50,000 shares of stock of Rush Skid & Pallet Co., Inc., which constituted *567 all the stock of that company except for qualifying shares. On September 10, 1971, Rush Skid & Pallet Co., Inc., deeded to Quinton W. Rush and petitioner as joint tenants with right of survivorship certain real property located in Mobile County, Alabama, which included the buildings and land used in the operation of Rush Skid & Pallet Co, Inc. These buildings and land were later deeded back to the corporation and were sold on April 18, 1974, for $95,000. On September 13, 1971, Quinton W. Rush transferred to himself and petitioner, as joint tenants with right of survivorship, a vendor's lien securing two notes given with respect to certain property in Saraland, Alabama. *5 One of the notes which was secured by the vendor's lien was for $16,000 and called for 240 monthly payments of $96.96, beginning on January 15, 1968, or $23,270.40. The other note was for $3,000 and required one payment of $3,000 on January 15, 1987. The total amount due under the notes secured by the vendor's lien was $26,270.40. As of October 6, 1971, 44 payments totaling $4,266.24 had been made on the notes which were secured by the lien, leaving payments due under the notes of $22,004.16. The various *568 transfers made by Quinton W. Rush to himself and petitioner as joint tenants with right of survivorship were made without consideration. In his last will and testament, Quinton W. Rush devised and bequeathed all of his property of every kind and nature, wheresoever situated, whether real, personal or mixed, absolutely and in fee simple to his wife, Virginia Dell Rush, the petitioner in this case. The will provided that Virginia Dell Rush be the executrix of the estate of Quinton W. Rush, and subsequent to his death she was appointed as executrix. Sometime prior to 1971, an investigation of Quinton W. Rush's tax liability for the calendar years 1967 and 1968 was begun. In April 1972, a notice of deficiency was issued to the estate of Quinton W. Rush, deceased, Virginia Dell Rush, executrix. A petition to this Court *6 was filed from that notice of deficiency and given docket No. 5705-72. On May 21, 1974, pursuant to agreement of the parties in the case of the estate of Quinton W. Rush, deceased, Virginia Dell Rush, executrix, docket No. 5705-72, a decision was entered that there were deficiencies in income taxes due from the estate of Quinton W. Rush for the taxable years *569 1967 and 1968 in the amounts of $8,618.17 and $13,350.78, respectively, and additions to tax for these respective years under the provisions of section 6653(b) in the amounts of $4,309.09 and $6,675.39, respectively. On April 10, 1972, a notice of deficiency for the calendar years 1967 and 1968 was mailed to Mabel M. Rush at her residence at Mobile, Alabama, determining deficiencies of $8,618.17 and $13,350.78, respectively, but no additions to tax. No petition was filed with the Tax Court from this notice of deficiency and the taxes as determined therein were assessed against Mabel M. Rush, but no collection has been made with respect to those taxes. In early 1975, since the assessment for the years 1967 and 1968 against the estate of Quinton W. Rush, deceased, Virginia Dell Rush, executrix, pursuant to the decision of this Court had not been paid, the account was assigned to a revenue officer of the Internal Revenue *7 Service for collection. The revenue officer determined that there were no assets of commercial value in the estate of Quinton W. Rush. The only property in the estate of Quinton W. Rush was some small amount of personal effects with no commercial value. *570 All other property which he had owned in mid-1971 had been conveyed to himself and petitioner, Virginia Dell Rush, as joint tenants with right of survivorship in August and September 1971 and upon Mr. Rush's death had become petitioner's property. The revenue officer valued the 15-plus acres of land located in Clarke County, Alabama, at the $7,927.65 for which it had been sold on August 16, 1974, based on her conclusion that there was no change in the value of this land between October 6, 1971, and August 16, 1974. The revenue officer valued the notes and vendor's lien as of October 6, 1971, at $22,004.16, which was the total amount remaining unpaid on the notes which were secured by the vendor's lien. The revenue officer valued the stock of Rush Skid & Pallet Co., Inc., at $58,302.62. This valuation was on the basis of 85 percent of the sales price of $95,000 received in April 1974 for the land and buildings used in the business operation of the corporation plus other assets less liabilities as shown on the corporate tax return for its fiscal year ending April *8 30, 1972, with a further adjustment hereinafter set forth. The revenue officer determined that there had *571 been an increase of approximately 15 percent in value of commercial property in Saraland, Alabama, between October 1971 and April 1974 from some investigation made around the area. From the $80,750 arrived at by taking 85 percent of $95,000, the revenue officer subtracted the cost of the land and buildings shown on the fiscal year 1972 corporate return of Rush Skid & Pallet Co., Inc., of $32,423.25. To the resulting amount she added the book value of the assets shown on the return to arrive at a total estimated fair market value of assets of the corporation. From this amount, she subtracted the corporate liabilities as shown on the return, thus arriving at the $58,302.62 as the value of the corporate stock. The corporate return of Rush Skid & Pallet Co., Inc., for its fiscal year ended April 30, 1982, shows the following items on Schedule G, "Depreciation": *9 Depreciation
Allowed or
Method of
Cost or
Allowable in
Computing
Depreciation
Other Basis
Prior Years
Depreciation
for this Year
Buildings
$ 7,229.67
$1,721.73
SL
$ 598.43
Furniture and
fixtures
1,546.14
614.83
SL
204.28
Transportation
equipment
16,706.94
10,942.40
SL/DDB
2,604.14
Machinery and
other equipment
13,111.90
5,203.30
SL/DDB
1,842.40
Land
25,193.58
Totals
$63,788.23
$5,249.25
*572 The balance sheet of the corporation shows the following as of the beginning and end of the corporate fiscal year ending April 30, 1972: *10 Beginning
End
of Taxable Year
of Taxable Year
Amount
Total
Amount
Total
Cash
$ (2,953.68)
$ (4,148.59)
Trade notes and accounts
receivable
Less allowance for bad
debts
10,835.87 14,614.30 Inventories
6,211.35 7,651.80 Other current assets
1,211.43 956.35 Other investments
8,448.03 Buildings and other fixed
depreciable assets
$61,999.09
$63,788.23
Less accumulated
depreciation
19,988.08
42,011.01 23,731.51
40,056.72 Other assets
1,338.46 74.44 Total assets
$ 58,654.44 $ 67,653.05 Accounts payable
$ 9,244.21 $ 8,703.33 Mtges., notes, bonds
payable in less than
1 yr.
20,219.89 20,670.29 Other current liabilities
4,104.96 8,836.99 Loans from stockholders
11,159.98 Mtges., notes, bonds
payable
in 1 yr. or more
2,779.70 1,201.30 Other liabilities
783.24 Capital stock: Common stock
30,000.00
30,000.00 30,000.00
30,000.00 Retained earnings--
Unappropriated
(8,477.56)
(12,918.84)
Total liabilities and
stockholders' equity
$ 58,654.44 $ 67,653.05 *573 ULTIMATE FINDINGS OF FACT 1. Petitioner is a transferee of assets of Quinton W. Rush and as such is liable for payment of his unpaid taxes and interest thereon to the date of the transfer of the property to the extent the amount does not exceed the value of the assets transferred to her on October 6, 1971, the date of transfer. *11 2. The stock of Rush Skid & Pallet Co., Inc., on October 6, 1971, had a fair market value of $58,000. The land in Clarke County had a fair market value on that date of $6,700, and the vendor's lien and notes transferred to petitioner and Mr. Rush on September 13, 1971, as joint tenants with right of survivorship had a fair market value on October 6, 1971, of $8,000. OPINION Section 6901(a)[2] provides the method of collection of liabilities from a transferee at law or in equity of property. Section 6901(c)[3] provides the period of limitation for assessment of a transferee liability. This *12 section provides that in the case of an initial transferee the period of limitation for assessment of transferee liability is 1 year after the expiration of the period of limitation for assessment against the transferor. Although no mention *574 was made of the issue at the trial, the petition alleges that the determination of a transferee liability against petitioner in this case is barred by the statute of limitations. *575 The record here shows that a determination of an addition to tax for fraud under section 6653(b) was made against the alleged transferor, Quinton W. Rush. A deficiency notice was sent to the estate of Quinton W. Rush, deceased, Virginia Dell Rush, executrix, and a petition was filed from this notice. The record further shows that on May 21, 1974, a decision was entered by this Court pursuant to agreement of the parties determining a deficiency in the tax of the estate of Quinton W. Rush, deceased, Virginia Dell Rush, executrix, for each of the years 1967 and 1968 and also determining additions to tax for these taxable years under the provision of section 6653(b). Section 6653(b) provides that if any part of any underpayment of tax is due to frand, there shall be added to the tax an amount equal to 50 percent of the underpayment. Section 6501(c)(1) provides that in the case of a false or fraudulent return with the intent to *13 evade tax, the tax may be assessed at any time. A determination of an addition to tax for fraud under section 6653(b) has uniformly been held to also be *576 a determination that the return for the year involved was false and fraudulent under section 6501(c)(1). Since the decision of this Court in the case of the estate of Quinton W. Rush is conclusive as to the fraud of Quinton W. Rush for each of the years 1967 and 1968, the statute of limitations on assessment is permanently open with respect to his tax liability for these years. Therefore, when notice of transferee liability was sent to petitioner on June 23, 1978, 1 year had not expired from the time of the expiration of the period of limitation for assessment of the tax against the transferor and the period of limitation for determination of the liability against petitioner was open under section 6901(c)(1). The exact issue presented here with respect to the statute of limitations was decided adversely to the contentions of petitioner in this case in Bartmer Automatic Self Service Laundry, Inc., v. Commissioner,35 T.C. 317, 322 (1960). In that case we pointed out that the parties had placed in evidence a stipulation that there were deficiencies in tax and additions to tax by reason of fraud due from the transferor and that this Court had adopted that stipulation *577 by a decision. We then stated: *14 That stipulation and its subsequent adoption by this Court constituted a confirmation of the transferor's fraud.The Code provides under such circumstances that an assessment may be made at any time against the delinquent taxpayer, i.e., no statute of limitations bars assessment. * * * By the same token, where no statute of limitations bars assessment against the transferor, none bars assessment against the transferee. Sec. 311(b), 1939 Code; sec. 6901, 1954 Code; Smith v. Commissioner,249 F.2d 218 (C.A. 5), affirming a Memorandum Opinion of this Court; Ruth Halle Rowen,18 T.C. 874, reversed on other grounds 215 F.2d 641 (C.A. 2). We therefore hold that the statute of limitations does not bar the assessment of the transferee liabilities here involved against petitioner. Section 6901 does not create a substantive liability, but provides a procedure by which the Government may collect taxes. Commissioner v. Stern,357 U.S. 39, 42 (1958). The burden of proof to show *578 that a person is liable as a transferee of property of a taxpayer and if so the amount of such liability, is on respondent. Section 6902(a); Gatto v. Commissioner,20 T.C. 830, 833 (1953). Whether a transferee liability exists is to be determined by State law. Commissioner v. Stern,supra.Therefore, in this case we must look to the law of the State of Alabama to determine the existence of a transferee liability. If we determine that such a liability exists, we must determine the value of the assessment transferred. Section 8-9-6 of the Code of Alabama 1975, provides that conveyances or assignments, in writing, or otherwise, of any interest in real or personal property with intent *15 to hinder, delay or defraud creditors, purchasers or other persons of their lawful actions, damages, forfeitures, debts or demands are void. [4] In Alabama, the concurrence of three elements is essential for a conveyance to be declared fraudulent under this section of the Code. It is necessary for one claiming such a transfer to be fraudulent to show there is *579 a creditor to be defrauded, a debtor intending to defraud and a conveyance of the property out of which the creditor might have realized his claim or some portion thereof. Roddam v. Martin,285 Ala. 619, 235 So.2d 654 (1970). Here, the record shows that there was a determination of deficiency and additions to tax against the estate of Quinton W. Rush and that there were no assets in the estate from which the tax and additions to tax might be collected since shortly prior to his death Quinton W. Rush transferred all his assets to *16 joint tenancy with his wife with right of survivorship so that they were hers upon his death. The taxes owed by Mr. Rush were for the years 1967 and 1968. Therefore Mr. Rush became liable for these taxes and additions to tax on April 15, 1968, and April 15, 1969, respectively. Respondent was therefore a creditor of Mr. Rush at the time of the transfer of his properties. The second element listed above, a debtor intending to defraud, has also been shown to exist in this case. The circumstances of the transfers here made, which show that investigation of Mr. Rush's tax liability had been started prior to the time of the transfer, *580 that Mr. Rush knew of his critical health condition and that he made the transfer without valuable consideration, are sufficient to establish a debtor intending to defraud. However, as the Alabama Supreme Court has interpreted section 8-9-6, it is not necessary in order to show a debtor intending to defraud to show actual fraud, but only necessary to show what has been referred to in Alabama as constructive fraud. In the recent case of Gordon v. Gorman,436 So.2d 851 (Ala. 1983), the court approved a holding of the lower court, reciting in this regard (at 854): The actionable fraud may be actual fraud or what is termed constructive fraud. Smith v. Wilder,270 Ala. 637, 120 So.2d 871 (1960). Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor. Constructive fraud, on the other hand, is based on facts and circumstances which the courts have said constitute legal fraud *17 irrespective of actual intent. The term "constructive fraud" is generally used in referring to those instances where a grantor, indebted at the time, conveys property on a good, as distinguished from a valuable, consideration. *581 Such conveyances are frequently referred to simply as voluntary conveyances. Smith v. Wilder,supra.
When a husband conveys certain property to his wife and that conveyance is attacked as a fraud on the husband's existing creditors, the wife bears the burden of proof that the conveyance was based on a valuable consideration, substantial and not merely nominal. The wife has the responsibility of proving the bona fide character of the underlying transaction. Gurley v. Blue [Rents] Rinse, Inc.,383 So.2d 531 ([Ala.] 1980).
*582 In Shaffield v. Shaffield,250 Ala. 381, 34 So.2d 591 (1948), the court specifically held that a conveyance by a husband to a wife based on love and affection and $1 is good rather than valuable consideration. In the present case, each of the transfers recited that the conveyance was made in consideration of the sum of $1 and other good and valuable consideration. However, this record clearly shows, by the admission of petitioner herself, that no actual consideration passed for the transfer. The only consideration petitioner claimed had passed was some money she claimed to have advanced to the corporation. However, the record shows that petitioner was referring to loans obtained by the corporation which she personally endorsed after Mr. Rush's death, when she was the owner of all of the stock of the corporation. Her claim was that effectively she lent $12,000 to the corporation since she personally endorsed a corporate note for that amount. *18 However, the record shows that this all occurred after Mr. Rush's death. The record is clear that the transfers made by Mr. Rush to petitioner were without consideration. Respondent has therefore established that *583 petitioner is liable as the transferee for taxes owed by the estate of Quinton W. Rush to the extent of the value of the assets transferred to her. Although the record leaves much to be desired with respect to the valuation of the assets transferred by Mr. Rush to petitioner, we have concluded that it is sufficient to establish that a value existed and the amount of that value. We have determined the value of the stock transferred to Mrs. Rush to be $58,000, primarily based on the balance sheet of the corporation as of April 30, 1971, and April 30, 1972, and revaluation of the land and buildings owned by the corporation. [5] The balance sheet itself, without any adjustment, shows an excess of assets over liabilities of approximately $24,000 at April 30, 1971, and approximately $17,000 at April 30, 1972. Included in these assets are the land and buildings which were sold on April 18, 1974, for $95,000. The balance *19 sheet shows that in addition to the land and buildings, Rush Skid & Pallet Co., Inc., had assets consisting of furniture and fixtures, transportation equipment, machinery and other equipment with a book value as of the beginning of its fiscal year 1972 of over *584 $14,000, and at the end of that taxable year with a book value of approximately $10,000. The record also shows that the transportation equipment and machinery and other equipment were depreciated partially on a double declining balance basis. It is therefore reasonable to assume that the actual value of the machinery was at least its book value and probably greater than its book value. The accounts receivable were stated to be after allowance for bad debts. It is therefore reasonable to assume that the actual value of the accounts receivable was approximately the book value. Using the fair market value of the land and buildings, based on the sales price of $95,000 in April 1974 adjusted to $80,750 as of October 6, 1971, because of increase in land values generally and the book value of other assets including machinery and equipment and furnishings, the total book value of all of the assets of the corporation as of April 30, 1972, is approximately $116,000. Subtracting from this the $50,571 of liabilities shown on the balance sheet on the return leaves a net of over $65,000. A comparable computation as *20 of April 30, 1971, shows a value of approximately $74,000. In our *585 view, these balance sheet values plus an adjusted value for the land and buildings to their approximate market value on October 6, 1971, are sufficient to support an amount of $58,000 as the value of the corporate stock transferred to petitioner at Mr. Rush's death on October 6, 1971. We recognize that this method of valuation is not precise, but nevertheless it does appear to support the value we have found for the stock. In our view, the sales price of the piece of property in Clarke County in 1974 supports a finding of an October 6, 1971, fair market value of $6,700. This is approximately 85 percent of its sales price in 1974. Although respondent's revenue officer testified that the purchaser told her this land had not increased in value from 1971, we question this conclusion considering that she concluded *586 on a more thorough investigation that the land and buildings used in the corporate business had increased. In our view, the vendor's lien and notes were not properly valued by respondent's witness. The document transferring the notes from Mr. Rush to Quinton W. Rush and Virginia Dell Rush as joint tenants with the right of survivorship states that there are two promissory notes secured by the vendor's lien, one for $3,000 and one for *21 $16,000, dated November 30, 1967. Because of the provision for the payment on January 15, 1987, of the $3,000 and the testimony of respondent's witness to this effect, we conclude that the $3,000 note was a noninterest-bearing note.The $16,000 note called for 240 monthly payments of $96.96 each, commencing January 15, 1968. The total payments on the $16,000 note would be $23,270.40, which would leave over a period of approximately 20 years interest of only $7,270.40. In 1971, a note bearing interest at the rate that the $16,000 note did and a noninterest-bearing note not payable for another approximately 15 years would clearly not have a fair market value of their face value. Respondent's witness merely totaled the amount of all payments *587 on the $16,000 note, added to that amount the $3,000 and subtracted the amounts which had been paid up to October 6, 1971, on the $16,000 note. In fact, this witness's determination of value of the two notes not only was incorrectly done, it exceeded the $19,000 principal of the two notes. Since it is expected that most assets will earn some income, the two notes should have been valued on the basis of the remaining unpaid principal.The $3,000 note bearing no interest and collectible only after 15 years would have a very minimal value. The $16,000 note would have either a value of a discount from the unpaid *22 balance of principal or the value of the unpaid value of principal, depending on the interest being paid on it as compared to the going interest rate. Although the record does not show the interest rate on this note, it appears from the total figures to have been somewhere between 4 and 5 percent. There is nothing in this record to show how nearly that approached a true fair market interest rate at October 6, 1971. In any event, based on what is in this record, we conclude that the $16,000 note which probably had a face value of between $14,000 and $15,000 on October 6, 1971, would *588 have been substantially discounted if sold on the market. Using our best judgment, we have concluded that the two notes and the vendor's lien transferred to petitioner at the date of Mr. Rush's death had a total fair market value of $8,000. We point out that we do not consider respondent's witness, the revenue officer, an appraisal expert. In arriving at our values, we have considered only her factual testimony and have given no weight to any opinion she expressed. Petitioner, at the trial, questioned the determination of the value of the stock, stating that in her opinion when she acquired it on October 6, 1971, it was worth approximately $30,000. She stated she based this opinion on an appraisal made in 1973 of the assets of *23 the corporation, including the land and buildings which had been transferred to Mr. Rush and her but retransferred to the corporation and used by the corporation in its operations, totaling $43,000. She did not produce this valuation and was unable to state how it was made, other than to state that it was made by someone at the bank. It is difficult to accept a claimed valuation of $43,000 for assets when the land and buildings were sold less *589 than a year after petitioner claimed the appraisal was made for $95,000. From our determination of a total value on October 6, 1971, of $72,700 for assett transferred to petitioner, it seems reasonably clear that sufficient assets were transferred to pay the tax liabilities and additions to tax determined against Mr. Rush, plus interest on the tax liability, from the respective due dates of the returns until the date of the transfer of the assets. However, since respondent's counsel was unable to furnish information as to this total amount at the time of the trial of the case, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, estate, and gift taxes.-- (A) Transferees.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), ↩
3. SEC. 6901. TRANSFERRED ASSETS. * * * (c) Period of Limitations.--The period of limitations for assessment of any such liability of a transferee or a fiduciary shall be as follows: (1) Initial transferee.--In the case of the liability of an initial transferee, within 1 year after the expiration of the period of limitation for assessment against the transferor;↩
4. Sec. 8-96, Code of Alabama 1975, provides as follows: Sec. 8-9-6. Conveyances or assignments of property, etc., to hinder creditors, etc., void. All conveyances or assignments in writing, or otherwise, of any estate or interest in real or personal property and every charge upon the same made with intent to hinder, delay or defraud creditors, purchasers or other persons of their lawful actions, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, action commenced or judgment suffered with the like intent, against the persons who are or may be so hindered, delayed or defrauded, their heirs, personal representatives and assigns are void. (Code 1852), sec. 1554; Code 1867, sec. 1865; Code 1876, sec. 2124; Code 1886, sec. 1735; Code 1896, sec. 2156; Code 1907, sec. 4293; Code 1923, sec. 8038; Code 1940, T. 20, sec. 7.)↩
5. The record is far from clear as to when the land and buildings were transferred back to the corporation. However, since respondent included them in valuing the stock and petitioner did not object to the method as distinguished from the amount of respondent's valuation of the stock, we have also included the land and buildings in valuing the stock as of October 6, 1971.↩